**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**David Victor MILLIGAN, Jr., Defendant–Appellant.**

**No. 01CA0435.**

Colorado Court of Appeals, Div. V.

Jan. 30, 2003.

As Modified on Denial of Rehearing April 24, 2003.

Certiorari Denied Sept. 22, 2003.

Ken Salazar, Attorney General, Katharine J. Gillespie, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Elisabeth Hunt White, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge ROTHENBERG.

Defendant, David Victor Milligan, Jr., appeals the judgment of conviction entered on a jury verdict finding him guilty of possession of a controlled substance. We affirm.

Officers responded to a female caller's complaint that an "unwanted person" named David Milligan was at the door of her apartment complex. She also reported that he drove a gray Cadillac.

The officers saw defendant standing near the door of the specified apartment and asked what he was doing there. Defendant gave his name and said he was checking on his ex-girlfriend. He also volunteered that he had outstanding warrants for his arrest and that a friend had dropped him off at the apartment.

While an officer was checking on the warrants, defendant was allowed to use his cell phone to call a friend, and during that call, an officer overheard him giving directions to his car. When defendant ended his call, officers asked defendant about the discrepancy between his statements, and defendant admitted he had driven to the scene.

Meanwhile, police dispatch informed the officers that defendant's license had been suspended and confirmed he had outstanding warrants. After receiving this information, an officer advised defendant of his rights, pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and further informed him he was under arrest and his car would be towed. The car was parked several houses away from the apartment, and defendant asked officers to retrieve his fanny pack from it. The officers located the fanny pack in the car, checked it for weapons, and found none. But, when defendant's possessions were inventoried at the police station, police discovered cocaine inside the pack. The following day, after again receiving a *Miranda* advisement, defendant admitted to police the drugs were his.

Defendant later filed a motion to suppress the physical evidence and his statement admitting it belonged to him. The trial court denied the motion, finding that the police had properly impounded his car, that the search of his fanny pack was a proper inventory search, and that the cocaine inevitably would have been discovered in an inventory search of the car.

At defendant's jury trial, his statements and the cocaine were admitted as evidence against him.

I.

Defendant contends the trial court erred in denying his motion to suppress. He maintains that: (1) the physical evidence was obtained through an illegal investigatory stop or seizure and an illegal impoundment and inventory of his car; and (2) his statements were obtained in violation of *Miranda v. Arizona, supra*. We disagree.

When we consider a trial court's suppression ruling, we defer to its findings of fact, but review de novo its conclusions of law. *People v. Smith*, 13 P.3d 300 (Colo. 2000). A trial court's determination whether a person was in custody for *Miranda* purposes is reviewed de novo. *People v. Matheny*, 46 P.3d 453 (Colo.2002).

A.

We first reject defendant's contention that his initial contact with police was an investigatory stop or a seizure made without articulable suspicion or probable cause.

The United States and Colorado Constitutions afford protection from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Colo. Const. art. II, § 7.

Three types of police-citizen encounters have been recognized: (1) consensu-

al interviews, (2) investigatory stops, and (3) arrests. Arrests and investigatory stops are seizures that implicate constitutional protections. Investigatory stops are justified by reasonable and articulable suspicion of criminal activity, while lawful arrests require probable cause. An investigatory stop is less intrusive than an arrest and is considered reasonable within the meaning of the Fourth Amendment if it is supported by "some minimal level of objective justification" designated "reasonable articulable suspicion." *People v. Polander*, 41 P.3d 698, 703 (Colo.2001)(quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990).)

■ A consensual interview is not a seizure and occurs when a police officer seeks the voluntary cooperation of a citizen by asking noncoercive questions. *People v. Johnson*, 865 P.2d 836 (Colo.1994). An officer's act of approaching an individual in a public place or asking for identification does not, in itself, constitute a seizure within the meaning of the Fourth Amendment. *People v. Paynter*, 955 P.2d 68 (Colo.1998).

■ Here, defendant's initial encounter with police constituted a consensual interview and not an investigatory stop or seizure. But, when the officers learned defendant had outstanding warrants against him, the encounter became an investigatory stop that was justified by defendant's voluntary statement. *See People v. Polander, supra; People v. Padgett*, 932 P.2d 810 (Colo.1997). Once the warrants were confirmed, the officers had probable cause to arrest defendant. *People v. Hillyard*, 197 Colo. 83, 589 P.2d 939 (1979).

Hence, defendant's initial encounter did not constitute an illegal investigatory stop or seizure.

## B.

Defendant next contends the trial court erred in denying his motion to suppress two statements he made to police before his *Miranda* advisement and the evidence obtained as a result of those statements. The first statement is his admission that he drove his car to the scene. The second statement is his request to the officers to retrieve his fanny pack from the car. Defendant maintains that his first statement led to the officers' decision to impound his car, which in turn led to his request that officers retrieve his fanny pack from the car and to discovery of the cocaine. We disagree.

### 1.

Initially, we address the People's contention that defendant challenges these two statements for the first time on appeal. We disagree.

■ The People correctly observe that defendant's pretrial motion to suppress did not mention these two statements or claim they were obtained in violation of *Miranda*. However, because the trial court addressed defendant's statements and the *Miranda* issue at the suppression hearing, we conclude the issue was properly preserved for appeal. *See People v. Cagle*, 751 P.2d 614 (Colo.1988).

### 2.

Turning to the merits of the *Miranda* issue, we agree with the trial court's ruling denying defendant's motion to suppress his two statements.

■ *Miranda* does not apply unless the defendant was in custody when the statement was made and the statement was obtained as a result of police interrogation. *People v. Haurey*, 859 P.2d 889 (Colo.1993).

In *People v. Matheny, supra*, the supreme court discussed the manner in which an appellate court should review a trial court's custody determination. Earlier cases described the test of custody as whether a reasonable person in the suspect's position would have considered himself or herself deprived of freedom of action in any significant way. *See People v. Hamilton*, 831 P.2d 1326 (Colo.1992).

However, *Matheny* requires a greater deprivation of freedom, explaining that a court should engage in "[a]n objective assessment of whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action *to the degree associated with a formal arrest*." *Peo-*

ple v. Matheny, supra, 46 P.3d at 467 (emphasis added)(quoting People v. Taylor, 41 P.3d 681, 691 (Colo.2002)).

■ Interrogation includes express questioning and any words or actions by the police, other than those normally attendant to arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect. People v. Haurey, supra.

As to defendant's first statement, the trial court found defendant was in custody, but was not formally under arrest when the officer asked him, "Did you drive here?" The trial court then proceeded to analyze the Miranda issue.

■ We conclude, however, that because a reasonable person in defendant's position would not have believed himself or herself to be deprived of his or her freedom of action to the degree associated with a formal arrest, and because the trial court expressly found defendant was not yet formally arrested, defendant was not in custody for Miranda purposes when the officer asked that question. See People v. Matheny, supra. Accordingly, Miranda has no applicability to that statement by defendant.

As to defendant's second statement asking the officers to retrieve his fanny pack from the car, we agree with defendant that he was in custody when he made it. At that time, the officers had verified the warrants against him. See People v. Padgett, supra.

■ However, we conclude the statement was not a result of police interrogation. Once the police decided to impound defendant's vehicle and informed him of that fact, he asked them to retrieve his pack. The police did not pose any question to defendant that prompted the statement about the fanny pack, nor did they make any statements or take any actions that they should have known were reasonably likely to elicit an incriminating response. See People v. Haurey, supra, 859 P.2d at 894. Thus, we conclude there was no Miranda violation as to that statement.

## II.

■ Defendant also contends the trial court erred in concluding the items discovered in his car were admissible under the inevitable discovery rule. We disagree.

The trial court found that once defendant was arrested and the officers became aware his car was parked nearby, the car would have been towed and impounded in accordance with police department procedure. Thus, the cocaine in the fanny pack would have been inevitably discovered. See People v. Clouse, 859 P.2d 228 (Colo.App.1992)(although initially discovered in an unlawful manner, evidence is admissible if it inevitably would have been obtained lawfully).

Defendant maintains, however, that the officers did not have a reasonable basis for towing his car. And, because their decision to tow his car led him to request that they retrieve his fanny pack containing cocaine, defendant argues that the evidence was illegally obtained and should have been suppressed. We are not persuaded.

■ If departmental regulations give police discretion whether to impound a vehicle, decisions to impound will be upheld as long as that discretion has been exercised according to standard criteria. Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). After validly impounding a vehicle, an officer may make an inventory search of its contents. See South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

Here, the officers were members of the Arvada Police Department, which has the following towing policy:

Whenever a driver of the vehicle is found to have [his or her] driving privileges suspended/revoked, [he or she] will not be allowed to drive from the scene. In such cases the vehicle must be driven away by a properly licensed driver, parked and locked with the owner's permission, or towed.

The officers testified that they learned defendant's driving privilege had been suspended and decided to tow his car after he was arrested because the car was parked illegally and no one was there to take control of it.

Although the trial court rejected the justification that the car was parked illegally, it also found, as relevant here, that the police had impounded the vehicle because "they realized [that] they were taking the defendant [into] custody; that the defendant had lied to them; that the defendant had, in fact, driven the car to the scene; that he did not have a license to do so; that the car was sitting there at the scene, and that was reason enough for [the decision]." The court also rejected defendant's argument that the impoundment was unnecessary because defendant's friend had been called to pick up the car and came to the scene to drive the car away.

■ The trial court correctly recognized that a decision to impound must be based on a standardized police policy or procedure. *See People v. Gee,* 33 P.3d 1252 (Colo.App.2001)(upholding trial court's finding that officers followed proper procedures in impounding the defendant's vehicle). The trial court credited the testimony of one of the officers who participated in the impoundment decision. The officer testified that where, as here, a vehicle was driven illegally and the driver has been arrested, the practice is to impound the vehicle, unless a passenger has a valid driver's license and is then allowed to drive the car away.

We therefore conclude the record supports the trial court's findings that the decision to impound defendant's car was in accordance with standardized police procedure and that the impoundment and inventory did not violate defendant's right to be free from unreasonable searches and seizures.

*United States v. Ibarra,* 955 F.2d 1405 (10th Cir.1992), does not support defendant's contention that he should have been given an opportunity to remove his car before impoundment. In *Ibarra,* the court considered a Wyoming statute authorizing impoundment if the "person in charge of the vehicle is unable to provide for its custody or removal" and concluded on multiple grounds the impoundment was not in accordance with that statute. Here, the towing policy does not expressly condition impoundment on the driver's inability to provide for custody or

removal. Hence, *Ibarra* is factually distinguishable from this case.

For these reasons, we perceive no error in the trial court's determination that the inventory search was proper and that the cocaine in defendant's fanny pack inevitably would have been discovered during an inventory of his vehicle. Accordingly, we conclude the trial court did not err in denying defendant's motion to suppress this evidence.

III.

Defendant next contends the trial court violated his constitutional rights to equal protection and due process and committed structural error in permitting jurors to question witnesses. He contends that he received inadequate notice that the juror questions would be allowed and that he is entitled to uniform proceedings and practice in all courts of the same class. We perceive no basis for reversal.

■ Structural errors affect "the framework within which the trial proceeds." *Griego v. People,* 19 P.3d 1, 7 (Colo.2001)(quoting *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991)); *see Blecha v. People,* 962 P.2d 931, 942 (Colo. 1998). Structural errors are not subject to a harmless error analysis. *See People v. Willcoxon,* — P.3d —, 2002 WL 31719852 (Colo.App. No. 01CA0524, Dec. 5, 2002)(the remedy for structural error is automatic reversal).

No federal circuit court of appeals has treated the issue of juror questioning as one of structural error. In fact, every federal appellate court considering the issue has upheld the decision to allow juror questioning as within the sound discretion of the trial court. *See United States v. Richardson,* 233 F.3d 1285 (11th Cir.2000); *United States v. Collins,* 226 F.3d 457 (6th Cir.2000); *United States v. Hernandez,* 176 F.3d 719 (3d Cir. 1999); *United States v. Feinberg,* 89 F.3d 333 (7th Cir.1996); *United States v. Bush,* 47 F.3d 511, 515 (2d Cir.1995)(concluding that allowing juror-originated questioning of witnesses lies within the trial court's discretion, but strongly discouraging the practice except in extraordinary or compelling circum-

stances); *United States v. Cassiere,* 4 F.3d 1006 (1st Cir.1993); *United States v. Groene,* 998 F.2d 604 (8th Cir.1993); *United States v. Polowichak,* 783 F.2d 410 (4th Cir.1986); *United States v. Callahan,* 588 F.2d 1078, 1086 (5th Cir.1979)("There is nothing improper about the practice of allowing occasional questions from jurors to be asked of witnesses.").

Similarly, the majority of the states that have considered the issue have permitted jurors to ask questions of witnesses. *See United States v. Richardson, supra,* 233 F.3d at 1289 (collecting decisions from twenty-five states approving the practice); *cf. State v. Costello,* 646 N.W.2d 204, 209 (Minn.2002)(prohibiting jury questioning, but recognizing the practice is "supported by the American Bar Association and is allowed, in some form or another, in federal courts and in the majority of states").

A few states have refused to do so. *See State v. Williamson,* 247 Ga. 685, 279 S.E.2d 203 (1981)(disapproving practice of allowing jurors to ask questions, but concluding reversal was not required; defendant's counsel approved the procedure by failing to object); *State v. Costello, supra; Wharton v. State,* 734 So.2d 985 (Miss.1998); *State v. Zima,* 237 Neb. 952, 468 N.W.2d 377 (1991)(disapproving practice, but concluding reversal was not required because defendant argued against prosecution's motion for mistrial and thereby invited the error); *State v. Gilden,* 144 Ohio App.3d 69, 759 N.E.2d 468 (2001); *Morrison v. State,* 845 S.W.2d 882 (Tex.Crim. App.1992). However, only two of these states—Minnesota and Texas—have refused to apply a harmless error analysis and have instead concluded that reversal is required. *See State v. Costello, supra; Morrison v. State, supra.*

In *State v. Costello,. supra,* 646 N.W.2d at 213, the Minnesota Supreme Court explained its reasons for not allowing jurors to question witnesses:

> [O]ur concern about allowing jurors to question witnesses is two-fold. First, the opportunity to pose questions may prevent jurors from keeping an open mind until all the evidence has been presented. Second, the opportunity to pose questions may up-

set the burden of production and persuasion in a criminal trial. We believe the passive-juror system minimizes these problems because jurors are (1) not enticed to form hypotheses or judgments about missing testimony; and are (2) prevented from affecting the production of evidence.

■ We are more persuaded, however, with the reasoning of the numerous decisions concluding that any error in this context is subject to a harmless error analysis and prejudice must be shown. *See United States v. Richardson, supra* (concluding defendant failed to present any evidence of prejudice resulting from the juror questioning).

Applying that standard of review here, we conclude the testimony elicited by the jurors was not new or different from other evidence already admitted. On the morning of trial, the court informed counsel that defendant's case would be part of the Colorado Supreme Court's pilot project, which allows jurors to submit written questions to witnesses. Defendant objected, pointing out that only even-numbered cases were to be included in the pilot project and therefore, his odd-numbered case should be excluded. He further objected to the lack of notice and maintained that the practice impermissibly shifted the prosecution's burden of proof and therefore violated due process. The trial court overruled his objections.

The court gave jurors the following instruction about the pilot project:

> [W]e're going to permit you folks, if you wish, to ask questions. It's up to you, but as you listen to a witness testify, if there's something you feel you would like to know that would help you better understand the case and the facts that hadn't come up in the questioning, you may write out the question on a piece of paper.
>
> We don't advise you start asking questions, but we would ask you to write those questions out on a [piece] of paper, and when the witness is finished that is when the lawyer is finished, then the bailiff will collect any questions you might have.
>
> I'll go over those with the lawyers and they can register any objections. I'll do that at the bench, I don't want [to] put the

lawyers on the spot in objecting to a juror's questions, and you can understand that they might not feel comfortable, but they have every right to object . . . .

[I]f there's a question that you ask that doesn't get, in turn, asked to the witness, don't think a thing about it, it's just sometimes things can't be asked. But we'll try to make sure that the questions get asked and you get the answers so you can do your job.

During the course of the trial, jurors submitted three written questions that were eventually propounded to witnesses over defendant's objections.

The first question asked a police officer: "What reason did [you] use to have the car impounded?" The officer responded:

Any time we make an arrest . . . if there is a vehicle on scene that is the owner's . . . . when we arrest them and take them into custody . . . we become responsible for their vehicle, for any damage that may occur to the vehicle, if it's stolen or anything like that, so we have their vehicles towed . . . so that we know that the vehicle is safe. . . .

A juror then asked this follow-up question: "Reason for revocation for illegal parking?" The court clarified the question to be whether "the reason for the decision to have the car impounded [was] the revocation of the driver's license or the illegal parking." The officer testified that he relied more upon the car's being illegally parked than defendant's license revocation. The officer then directly asked the juror, "Does that answer your question?" Defendant objected to the witness's question to the juror. The court overruled the objection and proceeded with other juror questions.

The next written question asked was: "Where was the field test for a controlled substance done, and what time?" The witness answered that the tests were performed at the police department shortly after defendant was processed.

The final written question asked was: "When impounding a car, is it locked up before towing, and is it inventoried for possessions?" Over defendant's objection, the witness answered that in the ordinary course, the key to the vehicle is given to the towing

company, and every possession in the vehicle is inventoried.

Defendant's case was assigned an odd number and thus should not have been included in the pilot project, and the better practice would be to provide more notice of the procedure. We also observe that the officer should not have been permitted to address a juror individually.

Nevertheless, we reject defendant's contention that the trial court's decision to allow written questions by the jurors constitutes structural error that requires automatic reversal, and defendant has not shown how these questions by the jurors prejudiced him. *See United States v. Thompson*, 76 F.3d 442, 449 (2d Cir.1996)(concluding trial court erred in permitting juror-originated questions to witnesses, but it was not structural error); *People v. Willcoxon, supra*, —— P.3d at —— (trial court erred by allowing jurors to take notebooks home overnight to study their contents, but it was not structural error). We therefore conclude the trial court's implementation of the pilot project did not violate defendant's constitutional rights, and the court's decision to permit juror questioning did not constitute an abuse of discretion.

Judgment affirmed.

Judge TAUBMAN and Judge WEBB concur.